# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RUBEN SILVA, (R17087), | ) |
| Petitioner, | ) |
| | ) Case No. 14 C 5203 |
| v. | ) |
| | ) |
| TARRY WILLIAMS, Warden, Stateville Correctional Center, | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Petitioner Ruben Silva's petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254(d). For the following reasons, the Court denies Silva's habeas petition and declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).[1]

## BACKGROUND

When considering habeas petitions, federal courts must presume the factual findings made by the last state courts to decide the case on the merits are correct unless the habeas petitioner rebuts those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Ford v. Wilson,* 747 F.3d 944, 947 (7th Cir. 2014). Where Silva has not provided clear and convincing evidence to rebut this presumption of correctness, the following factual background is based on the Illinois Appellate Court's factual findings in *People v. Silva,* No. 1-09-0601 (1st

---

[1] Petitioner's reply brief was due on or before November 7, 2014. To date, Petitioner has not filed his reply brief nor has he filed a motion for an extension of time to file his reply brief.

Dist. Sept. 24, 2010) (unpublished) and *People v. Silva,* No. 1-11-3358 (1st Dist. May 6, 2013) (unpublished).

I.      **Factual Background**

Silva and his co-defendant Dariel Webber ("Webber") were tried simultaneously before separate juries for the murder of Guadalupe Ramirez ("Ramirez") and the attempted murder of Juan Rodriguez ("Rodriguez") based on a shooting that took place on June 25, 2007, in the vicinity of 89th Street and Commercial Avenue in Chicago, Illinois. Silva's jury trial commenced on January 13, 2009.

Prior to the selection of Silva's jury, the Circuit Court of Cook County judge asked Silva's attorney whether she wanted the court to ask the potential jurors "any questions about the possibility of Ruben Silva not testifying." Counsel indicated that she did not. The court then conducted voir dire. First, the judge informed the approximately 50 potential jurors of the nature of the proceedings, their duties if called to serve as jurors, and the court's role in the trial. The trial court then told the venire that it would ask them 15 or 16 questions related to their qualifications to serve as jurors. The judge instructed the venire as follows:

> If the question applies to you ... you'll raise your right hand. We'll not talk about it now, however. We'll talk about it if you wind up in the jury box at some point this afternoon. At that point, we'll ask you did you raise your hand before any question I asked earlier today. If you did, tell me the question you raised your hand about. If I forget to ask, remind me ....[s]o one way or another we'll talk about it if you raised your hand for a question.

Thereafter, the court asked the venire the following questions as a group:

> There are certain things that apply, certain principles that apply in this case that apply in all cases of a criminal nature all around the United States. The one principle is the defendant, Mr. Ruben Silva[,] is innocent of the charges against him, and that presumption remains with him throughout every stage of the trial and is not overcome unless by your verdict, you come to the conclusion that the

> State has proven guilt beyond a reasonable doubt.
>
> Is there anybody who has any difficulty or quarrel with the principle that the accused person, in this case, Mr. Silva, is innocent of the charge against him, the State must prove guilt beyond a reasonable doubt?
>
> [N]o response.
>
> [T]he State ... ha[s] the burden of proving guilt beyond a reasonable doubt, and that burden stays on the [S]tate throughout the entire case. The defendant is not required to prove to you that he's innocent of the charges against him. Does anybody have any difficulty or quarrel with the principle that the State must prove guilt beyond a reasonable doubt and the defense must prove nothing to you?
>
> Again, no response.

The trial court then randomly selected 30 potential jurors and alternates and questioned them individually. Among other questions, the judge asked each potential juror— "Did you raise your hand before for any question I asked earlier today"—to which some of the potential jurors responded affirmatively. The jurors' questions, however, did not pertain to the questions highlighted above. Following the additional questioning, the parties and the judge selected 12 individuals to serve as jurors and two individuals as alternate jurors.

During the first day of Silva's jury trial, the following exchange occurred between counsel and the Circuit Court judge regarding a photograph:

> Assistant State's Attorney ("ASA"): It came to my attention after speaking with [defense counsel] today about her client, that there's ... one sentence in a police report, by the detectives, indicating that they told her client that there was a photograph of him in the area of 89th and Commercial. I went through my file twice, could not find anything.... There was no photograph inventoried. I asked the detective to look. He in fact did have a still photo, it's the back of a person on a bike in a tank top shirt.
>
> The court: Taken supposedly when?
>
> ASA: About 6:50 on the 25th of June, 2007. I indicated to him that we would not be using that photograph, we would not be questioning him about that because we never had it, never tendered it. I let [defense counsel] know. So that if she questions him about the

photograph, he's going to say he hasn't—but again, the [S]tate does not intend to use that in any way, shape or form.

Defense counsel: That photograph you said was taken from the rear, is that correct?

ASA: From the rear. You can see a face on the person and it's a grainy photograph. And he doesn't know why it was not included in the [file].

At Silva's January 2009 jury trial, shooting victim Rodriguez testified that at about 6:30 p.m. or 6:40 p.m. on June 25, 2007, the decedent Ramirez and he were at a restaurant at 89th Street and Commercial Avenue. While Ramirez was inside the restaurant ordering food, Rodriguez waited outside. At that time, Silva walked past and said that Rodriguez was not supposed to be on that block and then left. Rodriguez had seen Silva on previous occasions in front of James Bowen High School where members of the Latin Kings congregated. Rodriguez knew Silva's nickname was "Saigon" and that Silva was a Latin King. After Silva left, Rodriguez went inside of the restaurant and told Ramirez that they should leave, but they waited until Ramirez got his food.

Rodriguez further testified that ten to fifteen minutes later he left the restaurant and looked down the street, where he saw Silva riding up on a bicycle. Silva stopped and told Rodriguez that he should not be on the block, asked him what he was doing there, and then ask him where his friend was. Silva also told Rodriguez that he was a Latin King, his name was Saigon, and that he "ran" the block. Further, Rodriguez testified that Silva then pulled out a silver automatic gun from his waistband and pointed the gun at him. Ramirez then exited the restaurant and Silva pointed the gun and began firing at Ramirez. At that time, Silva was approximately three to four feet away from Rodriguez and Ramirez.

4

As Silva began firing his gun, his co-defendant Webber walked up and Silva told him to fire at Rodriguez. Rodriguez testified that he had seen Webber at Bowen High School in the past and that Webber was known as "Twin" because he has a twin brother. At that time, Webber pulled out a small, black revolver and started shooting at Rodriguez, after which Rodriguez attempted to run around Ramirez's truck parked nearby. Also, Rodriguez testified that when he went around Ramirez's truck, he saw Webber firing his gun while Webber was running northbound. Silva also fled on foot.

After Silva and Webber fled, Ramirez ran to the driver's side of his truck and Rodriguez ran for the passenger side. After they both got into the truck, Ramirez told Rodriguez that he had been shot. Ramirez began to drive toward a fire station on 93rd Street. At 91st Street, Ramirez told Rodriguez he could no longer drive because of his gunshot wounds. They exited the truck to switch drivers, but Ramirez fell to the ground after which Rodriguez called for an ambulance. During the call, police began to arrive and then the ambulance arrived. Rodriguez gave the police the shooters' nicknames and described what they were wearing. The ambulance took Ramirez to the hospital, where he later died. Rodriguez went to Area 2 headquarters and identified both Silva and Webber in a photo array. Later that night, Rodriguez identified Webber in a line-up and gave a handwritten statement to the ASA.

On cross-examination, Rodriguez answered questions about what Silva was wearing on the day of the shooting:

> Defense counsel: You remember what [Silva] was wearing on the bike or walking as you say?
>
> Rodriguez: Yes. The first time I did see him, he had a muscle shirt and I could see tattoos. And the second he came back he had covered it with a white shirt, so he was in a white shirt.

>Defense counsel: Excuse me, are you finished?

>Rodriguez: Yes.

>Defense counsel: When this person came back he had on different clothing, is that what you are saying?

>Rodriguez: He had the same thing underneath, but a white shirt now over it.

>Defense counsel: Was the shirt open?

>Rodriguez: No, it was just [a] white plain T-shirt, almost see through; thin white shirt.

>Defense counsel: Did he have on anything different other than that?

>Rodriguez: I don't believe so, ma'am, no. I believe he probably had a hat.

>Defense counsel: Do you remember if he had a hat the first time he came by?

>Rodriguez: I believe he did have a hat.

>Defense counsel: The second time you remember if he had a hat?

>Rodriguez: I don't think so. It was either [the] first time or second time he had a hat.
>...
>Defense counsel: What did he have on as far as pants?

>Rodriguez: I just [saw] when he lifted up, he had pants.

>Defense counsel: Do you remember what kind of pants he had on?

>Rodriguez: Blue jeans I believe.

>Defense counsel: They were blue?

>Rodriguez: Yes.

Also on cross-examination, Rodriguez admitted that he told the grand jury that he drove the truck from the restaurant, not that Ramirez had. Rodriguez also admitted on cross-examination that he testified before the grand jury that Silva was riding a bicycle the first time he

approached Rodriguez, and not on foot, as he had testified on direct examination. Furthermore, Rodriguez testified that he was a member of the Latin Counts gang and that his street name was Bam-Bam.

Chicago police officer Jaime Luna also testified at Silva's January 2009 jury trial. Specifically, Officer Luna testified that his partners and he received a call of shots fired near 91st Street and Commercial Avenue before 7 p.m. on June 25, 2007. When the officers arrived at 91st Street and Commercial, they found Ramirez lying on the ground with multiple gunshot wounds in his upper body. At that time, Rodriguez told Officer Luna that individuals named Saigon and Twin had shot Ramirez. Because Officer Luna had worked the district for several years, he knew Saigon and Twin and that they were Latin Kings. Officer Luna and his partners toured the area and within minutes found Webber, but did not recover a weapon.

A Chicago Police Detective testified that Rodriguez identified Silva as Saigon from a photo array the same day as the shooting. Two days later, police found Silva in Crown Point, Indiana and transported him to Area 2 in Chicago. The detective further testified that on July 4, 2007, Rodriguez identified Silva from a line-up as the person who shot Ramirez and told Webber to shoot him. Forensic scientists also testified at trial about the gunshot wounds and fired casings.

In closing, defense counsel attacked Rodriguez's credibility and inconsistent testimony. Counsel pointed to Rodriguez's inconsistent statements about Silva approaching on foot regarding their first encounter and the discrepancies regarding how long he was in the restaurant prior to Silva's return. She also noted that Rodriguez's testimony on what the perpetrator wore was inconsistent, that there was no physical evidence corroborating Rodriguez's testimony that

7

Silva was at the scene, and discussed that there was no evidence that a bicycle was found. Moreover, defense counsel argued that Rodriguez was in a rival gang.

On January 15, 2009, the jury found Silva guilty of first degree murder and attempted murder. After the guilty verdict, but prior to his February 11, 2009, sentencing, Silva wrote a letter to the trial judge alleging ineffective assistance of trial counsel. The Circuit Court judge then held a hearing to determine whether Silva's allegations warranted appointment of new counsel to represent these claims. At that time, Silva told the judge that defense counsel did not conduct a proper investigation into the potentially exculpatory photograph and stated that he saw this photograph when the Indiana police interrogated him. Furthermore, Silva stated that the photograph showed him on a different block at the time of the shooting and that he was wearing different clothes than Rodriguez had described.

In response, the ASA explained that the State did not have the photograph initially and that the detectives provided a copy to the State later. According to the ASA, the photograph showed the back of an individual on a bicycle in the area where the shooting took place. The State also asserted that the photograph was beneficial to the State because it showed a person in a white tank top that matched Rodriguez's description of Silva and that defense counsel realized this. The Circuit Court concluded that Silva did not make sufficient allegations of ineffective assistance of counsel to warrant appointment of new counsel under the circumstances, especially in light of the fact that the photograph was more favorable to the State. As such, the Circuit Court judge denied Silva's post-trial motion.

## II. Procedural Background

On February 11, 2009, the Circuit Court judge sentenced Silva to forty-five years for the murder conviction and ten years for the attempted murder conviction—to run consecutively. On direct appeal to the Illinois Appellate Court, First District, Silva argued that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the Circuit Court's voir dire failed to comply with Illinois Supreme Court Rule 431(b); (3) the Circuit Court misapprehended the applicable sentencing range; and (4) the Circuit Court failed to conduct an adequate hearing regarding his post-trial pro se claim of ineffective assistance of trial counsel. The Illinois Appellate Court, First District, affirmed and held that Silva forfeited his voir dire claim by failing to object at the time and failing to raise the issue in his post-trial motions. The appellate court further concluded that the Circuit Court sufficiently informed the venire of the principles in Illinois Supreme Court Rule 431(b). Silva then file a petition for leave to appeal ("PLA") to the Illinois Supreme Court arguing that the Circuit Court failed to comply Illinois Supreme Court Rule 431(b) that requires the trial judge to ask potential jurors whether they understood and accepted that Silva was not required to offer any evidence on his behalf. On January 26, 2011, the Illinois Supreme Court denied Silva's PLA.

On July 28, 2011, Silva filed a pro se petition for post-conviction relief in the Circuit Court of Cook County pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et seq.*, raising the following claims: (1) ineffective assistance of trial counsel; (2) the State withheld exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (3) prosecutors used Rodriguez's perjured testimony; (4) he is actually innocent of the crimes; (5) police transported him from Indiana to Illinois without a warrant; (6)

he was not brought before a magistrate within forty-eight hours of his arrest; (7) police arrested him without a valid warrant; (8) he was denied his constitutional right to a fair trial; and (9) appellate counsel was constitutionally ineffective.

The Circuit Court denied Silva's post-conviction petition after which Silva appealed. On appeal, Silva raised the following claims: (1) the State belatedly disclosed the exculpatory photograph of him in violation of *Brady*; (2) ineffective assistance of trial counsel based on counsel's failure to investigate the potentially exculpatory photograph; and (3) appellate counsel was ineffective for failing to raise the *Brady* claim and ineffective assistance of trial counsel claim based on the photograph. On May 6, 2013, the Illinois Court of Appeals, First District, affirmed the Circuit Court concluding that Silva forfeited his *Brady* and ineffective assistance of trial counsel claims by failing to raise them on direct appeal. The appellate court also rejected the ineffective assistance of appellate counsel claim under the standard set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Silva then filed his post-conviction PLA to the Illinois Supreme Court raising the following claims: (1) trial counsel was ineffective for failing to investigate the potentially exculpatory photograph; (2) trial counsel was ineffective for failing to insist that the Circuit Court ask the potential jurors during voir dire whether they understood and accepted Silva's right not to testify; (3) appellate counsel was ineffective for failing to assert an ineffective assistance of trial counsel claim; and (4) his post-conviction petition should have been transferred to another judicial district. On November 27, 2013, the Illinois Supreme Court denied Silva's post-conviction PLA.

**III.     Habeas Petition**

On July 8, 2014, Silva filed the present pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d)(1).  Construing his pro se habeas petition liberally, *see Ambrose v. Roeckeman,* 749 F.3d 615, 618 (7th Cir. 2014), Silva brings the following habeas claims:  (1) he was denied his constitutional right to a fair trial by an impartial jury in relation to the Circuit Court's voir dire because the judge failed to comply with Illinois Supreme Court Rule 431(b); (2) trial counsel was constitutionally ineffective for (a) failing to investigate the photograph of him and (b) failing to insist that the Circuit Court ask the jurors during voir dire whether they understood and accepted Silva's right not to testify; (3) appellate counsel was constitutionally ineffective for failing to argue that trial counsel was ineffective in regard to Illinois Supreme Court Rule 431(b); and (4) his post-conviction petition should have been transferred to another judicial district because there was a conflict of interest.

**LEGAL STANDARD**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the Court cannot grant habeas relief unless the state court's decision was contrary to, or an unreasonable application of federal law clearly established by the Supreme Court.  *See Williams v. Taylor,* 529 U.S. 362, 402-03, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Ruhl v. Hardy,* 743 F.3d 1083, 1091 (7th Cir. 2014).  Clearly established federal law for purposes of 2254(d)(1) includes only the holdings, as opposed to dicta, of the United States Supreme Court.  *See White v. Woodall,* 134 S.Ct. 1697, 1702 (2014).  In *Williams*, the Supreme Court explained that a state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if the state court confronts facts

11

that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *See id.* at 405; *see also Kamlager v. Pollard,* 715 F.3d 1010, 1015 (7th Cir. 2013) ("A state court decision is 'contrary to' federal law if it applies the wrong legal standard established by Supreme Court precedent or decides a case differently than the Supreme Court on materially indistinguishable facts.").

Under the "unreasonable application" prong of the AEDPA standard, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See Williams,* 529 U.S. at 407; *see also White,* 134 S.Ct. at 1702. The state court's application of federal law must be more than incorrect, it must be "objectively unreasonable." *Ford v. Wilson*, 747 F.3d 922, 952 (7th Cir. 2014); *see also Williams*, 529 U.S. at 410 ("*unreasonable* application of federal law is different from an *incorrect* application of federal law") (emphasis in original). To be considered objectively unreasonable, a state court's decision must be "well outside the boundaries of permissible differences of opinion." *Kamlager,* 715 F.3d at 1016 (citation omitted).

## ANALYSIS

### I. Claim Based on Illinois Supreme Court Rule 431(b)

In his habeas petition, Silva maintains that he was denied his constitutional right to a fair trial by an impartial jury because the Circuit Court judge did not strictly comply with Illinois Supreme Court Rule 431(b) in relation to voir dire. On direct appeal, the Illinois Appellate Court concluded that Silva had forfeited this claim because he did not object to the Circuit Court's administration of the voir dire at trial nor raise this argument in his post-trial motion.

Nevertheless, the Illinois Appellate Court reviewed Silva's claim for plain error. In doing so, the appellate court noted that Silva's specific argument was that the Circuit Court failed to properly inform the venire that Silva was not required to offer evidence on his own behalf. After reviewing the record, the Illinois Appellate Court concluded that the Circuit Court conducted voir dire in accordance with Rule 431(b), and thus no error occurred. Specifically, the Illinois Appellate Court reasoned:

> In its opening statements to the venire, the court informed the potential jurors as a group that it would ask them questions to ascertain their qualifications to serve as jurors. Specifically, the court asked the potential jurors whether they had any "difficulty or quarrel" with the principle that the accused is innocent unless and until the State proves him guilty beyond a reasonable doubt.

*People v. Silva,* No. 1-09-0601, at \*14. The appellate court further explained that although the Circuit Court's statements during voir dire did not specifically track the exact language of Rule 431(b), compliance with the rule does not require the court to provide "magic words" or a certain "catechism" to satisfy its mandate. *See People v. Ingram*, 401 Ill.App.3d 382, 393, 928 N.E.2d 1205, 1215, 340 Ill.Dec. 608, 618 (1st Dist. 2010). The Illinois Appellate Court thus concluded that the trial court informed the venire of the principle that Silva was not required to offer evidence on his behalf when it told him that "defendant is not required to prove to you that he's innocent of the charges against him" and that "the defense must prove nothing to you."

Respondent argues that this claim is not cognizable on habeas review because it is based on alleged errors of state law. To clarify, Silva is entitled to federal habeas relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). As the Seventh Circuit instructs, "[t]he remedial power of a federal habeas court is limited to violations of the petitioner's federal rights, so only if a state

13

court's errors have deprived the petitioner of a right under federal law can the federal court intervene. To say that a petitioner's claim is not cognizable on habeas review is thus another way of saying that his claim 'presents no federal issue at all.'" *Perruquet v. Briley,* 390 F.3d 505, 511 (7th Cir. 2004) (internal citations omitted). The Seventh Circuit, however, has recognized that a habeas petitioner's due process claim based on state court error may be cognizable because due process entitles a defendant to a fair trial, "but only if the state court committed an error so serious as to render it likely that an innocent person was convicted can the error be described as a deprivation of due process." *Id.* at 510; *see also Richardson,* 745 F.3d at 275. Under the circumstances, Silva has failed to meet this high standard, especially because the Illinois Appellate Court concluded that the Circuit Court did not commit any errors in the first instance. Accordingly, Silva's first habeas claim is without merit.

## II. Ineffective Assistance of Trial Counsel Claims

In his habeas petition, Silva maintains that his trial counsel was constitutionally ineffective because she failed to investigate an exculpatory photograph and also failed to insist that the Circuit Court ask potential jurors during voir dire whether they understood and accepted his right not to testify. To establish constitutionally ineffective assistance of trial counsel under the Sixth Amendment, Silva must show that (1) his trial attorney's performance "fell below an objective standard of reasonableness," informed by "prevailing professional norms" and (2) "but for counsel's unprofessional errors the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To reflect the wide range of competent legal strategies and to avoid the pitfalls of review in hindsight, [the Court's] review of an attorney's performance is highly deferential and reflects a

14

strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Groves v. United States,* 755 F.3d 588, 591 (7th Cir. 2014) (citation omitted). To establish prejudice, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding," instead trial counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Morgan v. Hardy,* 662 F.3d 790, 802 (7th Cir. 2011) (quoting *Strickland*, 466 U.S. at 687, 693). If Silva fails to make a proper showing under one of the *Strickland* prongs, the Court need not consider the other. *See id.* at 697 ("a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant"). Finally, as the Supreme Court teaches, because the "standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" when applying "the two in tandem, review is 'doubly so.'" *Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011).

### A. Investigation into Photograph

First, Silva argues that his trial counsel was constitutionally ineffective for failing to investigate an exculpatory photograph that shows a person a block away from the crime scene at the time of the shooting. In his post-trial motion, Silva maintained that the photograph showed that he was on a different block at the time of the shooting and that he was wearing different clothes than what Rodriguez had described at his jury trial. In response to Silva's post-trial argument, the ASA explained that the photograph showed the back of an individual on a bicycle in the area where the shooting took place and that the photograph was beneficial to the State because it showed a person in a white tank top that matched Rodriguez's description of Silva. At the post-trial hearing, the Circuit Court judge concluded that, indeed, this photograph was more

15

favorable to the State.

Assuming Silva did not procedurally default this ineffective assistance of counsel claim, *see Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014), the Court would be hard-pressed to conclude that counsel's conduct prejudiced him under the circumstances. More specifically, the Circuit Court judge concluded that this photograph was favorable to the State and not Silva. Further, the post-conviction appellate court, in the context of Silva's *Brady* claim, concluded that the photograph corroborated the eyewitness' testimony and that "the overall impact of the picture, if it had been shown to the jury, would have been to strengthen Mr. Rodriguez's key testimony and provided evidence of defendant's presence in close proximity to the scene." *People v. Silva,* No. 1-11-3358, at 11. Under these presumptively correct facts, there is no reasonable probability that, but for counsel's failure to investigate this photograph, the result of Silva's trial would have been different because the photograph was inculpatory, not exculpatory. *See Strickland,* 466 U.S. at 687-88.

### B. Inform Jurors of Right not to Testify

Next, Silva argues that his counsel was constitutionally ineffective because she failed to insist that the Circuit Court judge ask potential jurors during voir dire whether they understood and accepted his Fifth Amendment right not to testify. As discussed under Silva's claim based on Illinois Supreme Court Rule 431(b), the Illinois Appellate Court concluded that the trial court properly informed the venire of the principle that Silva was not required to offer evidence on his behalf when it told them that "defendant is not required to prove to you that he's innocent of the charges against him" and that "the defense must prove nothing to you." Further, the trial court asked the potential jurors if they had any problem with these principles, to which there was no

16

response.

Assuming this claim is not procedurally defaulted, Silva cannot establish prejudice under *Strickland* because—despite counsel's failure not to insist that the trial judge ask the jurors whether they understood this principle and accepted Silva's right not to testify—the trial court did inform the venire that Silva was not required to offer evidence on his own behalf, albeit not at trial counsel's behest. Furthermore, when instructing the jury before they deliberated, the trial court stated that the "fact that the Defendant did not testify should not be considered by you in any way at arriving at your verdict." (R. 12-15, Ex. O, Trial Tr., at T-71-72.) Thus, the jury instructions cured any alleged error resulting from trial counsel's performance in failing to insist that the Circuit Court judge ask potential jurors whether they understood and accepted Silva's Fifth Amendment right not to testify. In sum, Silva cannot establish that, but for counsel's alleged error, the result of his proceedings would be different because any such error was ameliorated by the trial court's proper inquiries under Rule 431(b). *See Groves,* 755 F.3d at 591.

## III. Ineffective Assistance of Appellate Counsel Claims

In his habeas petition, Silva also argues that his appellate counsel was constitutionally ineffective for not arguing that trial counsel was ineffective in regard to Illinois Supreme Court Rule 431(b). As with ineffective assistance of trial counsel claims, courts apply the two-prong test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to evaluate the effectiveness of appellate counsel. *See Warren v. Baenen,* 712 F.3d 1090, 1105 (7th Cir. 2013). Under the *Strickland* performance prong, an appellate counsel's performance is constitutionally deficient if counsel fails to appeal an issue that is obvious and clearly stronger than the claims counsel raised on appeal. *See Blake v. United States,* 723 F.3d 870, 888 (7th Cir.

17

2013); *Johnson v. Thurmer,* 624 F.3d 786, 793 (7th Cir. 2010). In this context, appellate counsel need not raise every non-frivolous claim, but should select among claims to maximize the likelihood of success on appeal. *See Smith v. Robbins,* 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000); *McNary v. Lemke,* 708 F.3d 905, 920 (7th Cir. 2013). To establish the *Strickland* prejudice prong, Silva must show that there is a reasonable probability that the issue appellate counsel did not raise would have changed the outcome of the appeal. *See Richardson,* 745 F.3d at 273.

Again, assuming this claim is not procedurally defaulted, the Illinois Appellate Court on direct review concluded that there was no error in the trial court's voir dire and that the court sufficiently informed the venire of the principles set forth in Rule 431(b). Hence, any argument on appeal that trial counsel was constitutionally ineffective for failing to secure compliance with Illinois Supreme Court Rule 431(b) is without merit. *See Ashburn v. Korte,* 761 F.3d 741, 751 (7th Cir. 2014) ("Without a meritorious [] claim," petitioner "cannot possible demonstrate that he was prejudiced by his appellate counsel's failure to argue such a claim."). Therefore, Silva cannot establish his ineffective assistance of appellate counsel claim under *Strickland*.

## IV. Improper Venue

Last, construing Silva's pro se habeas petition liberally, he argues that the Circuit Court erred by not transferring his post-conviction petition to another judicial district because his post-conviction appellate counsel was an attorney at the same appellate defender's office as his counsel on direct appeal. It appears that Silva is arguing that venue was improper.

As explained above, Silva is entitled to federal habeas relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

§ 2254(a). Whether venue was proper for his post-conviction proceedings is a question of state law, *see* 725 ILCS 5/122-1, and therefore, this aspect of Silva's claim is not cognizable on habeas review. *See Perruquet,* 390 F.3d at 511; *see also Estelle v. McGuire,* 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (errors of state law are not cognizable in a petition for habeas corpus).

Also, Silva does not point to clearly established federal law, as decided by the Supreme Court, that there is a conflict of interest when different attorneys from the same public defender's office represent a defendant in both direct and post-conviction proceedings nor could the Court find any. *See* 28 U.S.C. 2254(d)(1); *White,* 134 S.Ct. at 1702. In fact, the Seventh Circuit has recognized that there is not an automatic conflict when counsel from the same public defenders' office represent an individual at different stages of his criminal and post-conviction proceedings. *See Barnhill v. Flannigan,* 42 F.3d 1074, 1078 (7th Cir. 1994). In addition, the Court notes that post-conviction counsel did, in fact, argue that direct appellate counsel was constitutionally ineffective, and thus the record belies Silva's conflict argument. *See id.*; *see, e.g., Walls v. Hardwig,* No. 97 C 7980, 2000 WL 201547, at *4 (N.D. Ill. Feb. 16, 2000). Accordingly, Silva's last habeas claim fails.

**V.     Certificate of Appealability**

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant Silva a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) in the present order. *See Gonzalez v. Thaler,* ___ U.S. ___, 132 S.Ct. 641, 649 n.5, 181 L.Ed.2d 619 (2012).

19

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition, instead, he must first request a certificate of appealability. *See Miller-El v. Cockrell,* 537 U.S. 322, 335, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003). Moreover, a habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *See Miller-El,* 537 U.S. at 336; *Thomas v. Zatecky,* 712 F.3d 1004, 1006 (7th Cir. 2013); 28 U.S.C. § 2253(c)(2). Under this standard, Silva must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El,* 537 U.S. at 336 (quoting *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)).

Here, Silva has failed to make a substantial showing of the denial of a constitutional right because he has not sufficiently explained why jurists of reason would debate that the Court should have resolved the present habeas petition in a different manner. *See Peterson v. Douma,* 751 F.3d 524, 528 (7th Cir. 2014). Therefore, the Court declines to certify any issues for appeal. *See* 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For these reasons, the Court denies Silva's petition for a writ of habeas corpus and declines to certify any issues for appeal. *See* 28 U.S.C. §§ 2253(c)(2), 2254(d).

**Dated:** November 17, 2014

**ENTERED**

**AMY J. ST. EVE**
**United States District Judge**